GORDON SILVER
BRIGID M. HIGGINS, ESQ.
Nevada Bar No. 5990
E-mail: bhiggins@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
Attorneys for Nevada State Bank

E-Filed On January 7, 2010

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>REGAL PLAZA, INC., a Nevada corporation<br><br>                  Debtor. | Case No.: BK-S-10-26707-LBR<br>Chapter 11<br><br>Date:  January 12, 2011<br>Time:  2:00 p.m. |

**OBJECTION TO MOTION FOR ORDER: (1) APPROVING ADEQUACY OF DISCLOSURES IN PROPOSED DISCLOSURE STATEMENT AND (2) SETTING A CONFIRMATION HEARING, RECORD DATE AND DEADLINES FOR BALLOTING AND OPPOSITIONS TO CONFIRMATION**

Nevada State Bank, a Nevada corporation (the "Bank") by and through its counsel, the law firm of Gordon Silver, hereby submits its Objection ("Objection") Motion for Order: (1) Approving Adequacy of Disclosures in Proposed Disclosure Statement and (2) Setting a Confirmation Hearing, Record Date and Deadlines for Balloting and Oppositions to Confirmation (the "Motion").

This Objection is made and based on the points and authorities which follow, the Declaration of Robert Ferra (the "Ferra Declaration"), the Declaration of Timothy J. Morse (the "Morse Declaration"), the papers and pleadings contained in the Court's file, judicial notice of which is hereby requested, and any evidence or oral argument presented at the time of the hearing on the Motion.

DATED this 7th day of January, 2010.

GORDON SILVER

By: /s/ Brigid M. Higgins
BRIGID M. HIGGINS, ESQ.
Nevada Bar No. 5990
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Attorneys for Nevada State Bank

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

# POINTS AND AUTHORITIES

## I.
## STATEMENT OF FACTS

**A. The Loan and Loan Documents.**

1. On or about September 24, 2004, the Bank made a loan to Regal Plaza, LLC (the "Debtor") in the original principal amount of $8,320,000.00 (the "Loan"). The Loan was initially evidenced by a Promissory Note, dated September 24, 2004 (the "Original Note"). See Ferra Declaration, p. 2, ll. 2-4; a true and correct copy of the Original Note is attached to the Ferra Declaration as Exhibit "1". The Original Note called for payments of monthly interest with the principal and any accrued interest due at maturity. The Original Note matured twelve (12) months after the Original Note was funded. See Original Note, ¶2(a).

2. The Loan, as evidenced by the Original Note, was secured by a Deed of Trust, dated September 27, 2004 and recorded on September 30, 2004 as Instrument No. 20040930-0003675 in the Official Records of the Clark County Record's Office (the "Original Deed of Trust") on, among other things, certain real property as defined in the Deed of Trust (the "Real Property"). See Ferra Declaration, p. 2, ll. 9-13; a true and correct copy of the Original Deed of Trust is attached to the Ferra Declaration as Exhibit "2."[1]

3. The Loan was made to Debtor to acquire the Real Property and make certain improvements and renovations on the Real Property. See Ferra Declaration, p. 2, ll. 15-16.

4. In connection with the Loan, Debtor also granted and assigned to the Bank an absolute right to all rents, issues and profit generated by the Real Property and improvements securing the Loan, which assignment is evidenced by the Assignment of Leases And Rents,

---

[1] The Original Deed of Trust was modified on May 14, 2009 by that certain Modification To Deed Of Trust dated May 14, 2009 and recorded on September 25, 2009 as Instrument No. 20090925-0003234 in the Official Records of the Clark County Record's Office (the "Modified Deed of Trust" and together with the Original Deed of Trust, the "Deed of Trust"). See Ferra Declaration, p. 2, fn. 1; a true and correct copy of the Modified Deed of Trust is attached to the Ferra Declaration as Exhibit"3."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

dated September 24, 2004 and recorded on September 30, 2004 as Instrument No. 20040930-0003676 in the Official Records of the Clark County Record's Office (the "Assignment"). See Ferra Declaration, p. 2, ll. 17-21; a true and correct copy of the Assignment is attached to the Ferra Declaration as Exhibit "4."

5.  The Loan was further governed by the terms of various documents, including, but not limited to, a Construction Loan Agreement dated September 24, 2004. A true and correct copy of the Construction Loan Agreement is attached to the Ferra Declaration as Exhibit "5."

6.  The principal of the Debtor, Delta Point, L.L.C., and the John L. Carnesale Trust of 1995, Louis Carnesale and John L. Carnesale (together, the "Guarantors") executed those certain Guaranty agreements which guaranteed the indebtedness of Debtor, including the amounts due under Original Note, as subsequently amended ("Guarantees"). See Ferra Declaration, p. 3, ll. 1-4; a true and correct copy of the Guaranty agreements are attached to the Ferra Declaration as Exhibits "6" and "7."

7.  Thereafter at the request of Debtor, the Original Note was extended twelve (12) times in order to accommodate the Debtor as follows:

(i) on September 30, 2005 by that certain Modification To Loan Documents which extended the maturity date of Original Note for thirty (30) days.

(ii) on November 20, 2005 by that certain Second Modification To Loan Documents which extended the maturity date an additional ninety (90) days.

(iii) on February 28, 2006 by that certain Third Modification To Loan Documents which extended the maturity date an additional thirty (30) days.

(iv) on March 28, 2006 by that certain Fourth Modification To Loan Documents which extended the maturity date an additional thirty (30) days.

(v) on April 28, 2005 by that certain Fifth Modification To Loan Documents which extended the maturity date an additional sixty (60) days.

(vi) on June 28, 2006 by that certain Sixth Modification To Loan Documents which extended the maturity date an additional six (6) months and revised the floor on the interest rate to 8.50% per annum. The Sixth Modification also provided that the Debtor could "sell parcels of the [Real] Property" on the condition that the Bank received the "greater of one hundred

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

3

percent (100%) of the net proceeds from the sale of the respective Sales Parcels (net of customary and typical expenses acceptable to Bank) or $810,216.00 (net of customary and typical expenses acceptable to Bank)." See Sixth Modification, p. 4, ¶7(a).

(vii) on July 28, 2007 by that certain Seventh Modification To Loan Documents which extended the maturity date an additional three (3) months and stated that no further advances were available under the Original Note, as amended. See Seventh Modification, p.1., Recitals ¶C.

(viii) on October 28, 2007 by that certain Eighth Modification To Loan Documents which extended the maturity date an additional thirty (30) days and that no further advances were available under the Original Note, as amended. See Eighth Modification, p.1., Recitals ¶C.
(ix) on November 28, 2007 by that certain Ninth Modification To Loan Documents which extended the maturity date an additional ninety (90) day and that no further advances were available under the Original Note, as amended. See Ninth Modification, p.1., Recitals ¶C.
(x) on April 14, 2008 by that certain Tenth Modification To Loan Documents which extended the maturity date an additional thirty (30) days.

(xi) on May 14, 2008 by that certain Eleventh Modification To Loan Documents which extended the maturity date an additional one year and that no further advances were available under the Original Note, as amended. See Eleventh Modification, p.1., Recitals ¶C. Pursuant to the Eleventh Modification, the Debtor agreed to make monthly principal and interest payments commencing July 1, 2008, of Sixty Four Thousand Two Hundred Forty-Two and 26/100 Dollars ($64,242.26) at a fixed rate of 7% per annum. See Eleventh Modification, p. 2, ¶1-3.

(xii) on May 14, 2009 by that certain Twelfth Modification To Loan Documents which extended the maturity date an additional two years. In addition, the Bank agreed to make one additional advance of $500,000.00 under the Original Note, as amended, subject to certain terms and conditions, for disbursement of leasing commissions and tenant improvements. See Twelfth Modification, p. 2, ¶1. The interest rate was modified to the Bank's thirty day LIBOR plus 3.95%, adjusted monthly, with a floor of 6%. The Debtor agreed to make monthly principal and interest payments from June 2009 to September 2009 of Forty-Four Thousand Seventy-One and 07/100 Dollars ($44,071.07) and thereafter, commencing October 1, 2009 of Forty-Seven Thousand Thirty--Six and 28/100 Dollars ($47,036.28).

(collectively, the "Modifications", and together with the Original Note, the "Note"). True and correct copies of the Modifications are attached to the Ferra Declaration as Exhibits "8" through "19," respectively.[2]

---

[2] The Note, the Deed of Trust, the Modified Deed of Trust, the Assignment, the Construction Loan Agreement, the Modifications and other documents executed in connection with the Loan are collectively referred to hereinafter as the "Loan Documents."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

B. **The Default, Receivership Action and Bankruptcy Filing.**

8. On or about April 1, 2010, the Debtor failed to pay the amounts owing to the Bank under the terms of the Loan Documents and Debtor was in default of the terms of Loan Documents. Accordingly, pursuant to the terms of the Loan Documents, all outstanding principal, all accrued interest, and all related fees and charges due under the Note became fully due and payable. See Ferra Declaration, p. 5, ll. 16-20.

9. Due to Debtor's default under the Loan Documents, a Notice of Breach and Election to Sell Under Deed of Trust was recorded in the Official Records of the Clark County Record's Office on July 16, 2010, as Instrument No. 201007160001998 ("Notice of Breach and Election to Sell"). See Ferra Declaration, p. 5, ll. 21-24; a true and correct copy of the Notice of Breach and Election to Sell is attached to the Ferra Declaration as Exhibit "20."

10. On August 3, 2010, the Bank commenced an action (Case No. A-10-622228-B) in the Eighth Judicial District Court, Clark County, Nevada ("State Court") for among other claims, the appointment of a receiver and the breach of the Guaranties. See Ferra Declaration, p. 6, ll. 1-3.

11. On August 18, 2010, the State Court entered an Order Appointing Receiver. See Ferra Declaration, p. 6, ln. 4; a true and correct copy of the Order Appointing Receiver is attached to the Ferra Declaration as Exhibit "21."

12. On September 1, 2010 ("Petition Date"), Debtor filed the above-captioned Chapter 11 bankruptcy proceeding (the "Bankruptcy Case"). See Ferra Declaration, p. 6, ll. 6-7.

13. As of the Petition Date, the unpaid principal balance of the Loan/Note was in the amount of Seven Million Two Hundred Forty-One Thousand Eight Hundred Six and 31/100 Dollars ($7,241,806.41), with accrued interest as of the Petition Date in the amount of Two Hundred Forty-Three Thousand Five Hundred Eighty-Eight and 90/100 Dollars ($243,588.90) and accrued interest after the Petition Date to January 1, 2011 of Two Hundred Thirty-Four

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

5

Thousand Eight Hundred Fifteen and 17/100 Dollars ($234,815.17). Pursuant to the terms of the Loan Documents, other ancillary fees and costs were also incurred prior to the Petition Date, including attorneys' fees and costs incurred in the Receivership Action of $10,686.30 and foreclosure fees of $10,702.60. See Ferra Declaration, p. 6, ll. 17-16.

14.  On October 26, 2010, Debtor's counsel forwarded a rent roll to the Bank's counsel via email dated October 24, 2010 ("October 2010 Rent Roll"). See Higgins Declaration, p. 2, ll. 1-3; see also, a true and correct copy of the October 2010 Rent Roll attached thereto as Exhibit "1."

15.  On November 30, 2010, the Debtor filed the proposed Disclosure Statement ("Original Proposed Disclosure Statement"). See Docket No. 43. The Original Proposed Disclosure Statement was amended on December 23, 2010, by the Disclosure Statement ("Proposed Disclosure Statement"). See Docket No. 51. Attached as Exhibit "D" to the Proposed Disclosure Statement was the two-page cover letter from the appraiser retained by counsel for Debtor purporting to set forth the valuation of the Real Property, but not the actual Summary Appraisal Report referenced therein.

16.  On December 13, 2010, the Debtor filed the Motion For Order: (1) Approving Adequacy of Disclosures in Proposed Disclosure Statement And (2) Setting A Confirmation Hearing, Record Date And Deadlines For Balloting And Oppositions To Confirmation. See Docket No. 45. On December 23, 2010, Debtor filed the Supplement to Motion For Order: (1) Approving Adequacy of Disclosures in Proposed Disclosure Statement And (2) Setting A Confirmation Hearing, Record Date And Deadlines For Balloting And Oppositions To Confirmation ("Supplement to Motion to Value") which identified the changes set forth in the Proposed Disclosure Statement. See Docket No. 53.

17.  On December 27, 2010, the Debtor filed the Motion To Establish Values of Shopping Center For Purposes of Plan of Reorganization (the "Motion to Value"). See Docket

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

No. 55. In conjunction with the Motion To Value, the Debtor filed the Declaration of Charles E. Jack, IV, Appraiser (the "Jack Declaration"). See Docket No. 56. The Appraisal Summary Report of Charles E. Jack, IV (the "Jack Appraisal") was attached to the Jack Declaration.[3]

18. During the course of the Bankruptcy Case, Debtor has filed only one Monthly Operating Report for the month of September 2010 filed on October 21, 2010. See Docket No. 33. Despite Debtor's assertions to the contrary in the Proposed Disclosure Statement, Debtor has not filed Monthly Operating Reports for the months of October or November, 2010. See Proposed Disclosure Statement, p. 15, ll. 26-28, p. 16, ll.1-3.

C. **The Real Property and Valuation.**

19. The Real Property is a one-story retail strip center located on 5.72 acres at the southeast corner of Craig Road and Jones Boulevard. See Morse Declaration, p.2, ll. 2-3. The center has three attached buildings with total rentable space of 56,097 square feet and is configured in an "L" shape. The minor anchor building is situated in the southeast corner of the site with one in-line building (attached) extending north and the other extending west. The north portion of the center consists of 15,810 rentable square feet. The west portion has 12,600 rentable square feet. The minor anchor space contain 27,687 rentable square feet and is in the process of being built-out. See Morse Declaration, p. 2, ll. 3-8.

20. The Bank commissioned Timothy J. Morse ("Morse") of Timothy R. Morse & Associates to prepare an appraisal of the Real Property for purposes of developing an opinion of the value of the Real Property. See Morse Declaration, p. 1, ll. 26-28 and p. 2, ln. 1. Morse prepared a Self-Contained Appraisal Report dated November 15, 2010 ("Appraisal Report"). A true and correct copy of the Appraisal Report is attached to the Morse Declaration as Exhibit "1." Morse determined that the "highest and best use" for the Real Property is its "existing use

---

[3] The Jack Appraisal has numerous references to the "Mesquite" community and Mesquite economy which have no bearing on the Real Property and presumably have been copied over from an old appraisal.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7

as a strip retail center." See Morse Declaration, p.2, ll. 10-12; see also Appraisal Report, p. 47. Morse determined that the "as is" market value of Real Property on October 15, 2010 was Four Million Two Hundred Thousand Dollars ($4,200,000.00). See Morse Declaration, p. 2, ll. 12-13; see Appraisal Report, pp. 103-109. Morse further determined that the "as complete" and "as stablized" value as of April, 2011 is Six Million Three Hundred Fifty Thousand Dollars ($6,350,000). See Morse Declaration, p. 2, ll. 14-16; see Appraisal Report, pp. 101-102.

21.   In general, the Proposed Disclosure Statement provides that Debtor's proposed Plan of Reorganization ("Proposed Plan") proposes to pay the Bank (Class 2a) on its secured claim interest only for 2 years after the "Effective Date" at 3% per annum for an estimated interest payment of $18,750 per month. See Proposed Disclosure Statement, p. 19, ll. 14-16, 21-22.   The Debtor underestimates the Bank's Secured Claim at $7,500,000.  Thereafter, the Proposed Plan proposes to pay the Bank monthly principal and interest payments amortized over 30 years, due in full in 10 years after the Effective Date, at an interest rate of 4% for an estimated monthly payment of $35,806.15. See Proposed Disclosure Statement, p. 19, ll. 16-17, 18-20, 23-24.[4]  The Proposed Disclosure Statement and the Proposed Plan provide that the Loan, as modified by the Plan, will be assumable.  See Proposed Disclosure Statement, p. 19, ll. 20-21. These payments are to be paid "from the rents collected from the Tenants and from refinancing or sale." See Proposed Disclosure Statement, p. 19, ll. 17-18.

## II.
## LEGAL AUTHORITY

A.   **Standard For Approval Of A Disclosure Statement.**

Section 1125(b) of the Bankruptcy Code generally provides that the acceptance or rejection of a plan of reorganization may not be solicited after commencement of the case unless

---

[4] The actual interest rate and payments commencing on the 25th month after the Effective Date are still wholly unclear as described in the Proposed Disclosure Statement and Proposed Plan. Although the Supplement to Motion to Value seems to clarify Debtor's intended terms, the Proposed Disclosure Statement and Proposed Plan are still unclear. On those grounds, the Bank objects to the adequacy of the Proposed Disclosure Statement.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

8

and until a proposed disclosure statement containing "adequate information" is served on all holders of a claim or interest, and the proposed disclosure statement is approved by the court after notice and hearing.

"Adequate information" is defined by Section 1125(a)(1) of the Bankruptcy Code as follows:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan; . . .

11 U.S.C. § 1125(a)(1). Stated another way, a disclosure statement should contain "all material information relating to the risks posed to creditors and equity interest holders under the plan." In re Cardinal Congregate I, 121 B.R. 760 (Bankr. S.D. Ohio 1990).

The determination of what meets the statutory definition of "adequate information" is subjective and made on a case by case basis, and is largely within the discretion of the bankruptcy court. See In re Texas Extrusion Corp., 844 F.2d 1142, 1157 (5th Cir. 1988). A bankruptcy court must deny approval of a proposed disclosure statement if the statement fails to provide adequate information. See In re S.E.T. Income Props., III, 83 B.R. 791 (Bankr. N.D. Okla. 1988).

In applying Section 1125 of the Bankruptcy Code, courts have developed a list of the types of information of which disclosure may be mandatory, under the facts and circumstances of a particular case, to meet the statutory requirement of adequate disclosure. Such information includes:

1. The events which led to the filing of a bankruptcy petition;
2. A description of the available assets and their value;
3. The anticipated future of the company;
4. The source of information stated in the proposed disclosure statement;
5. A disclaimer;
6. The present condition of the debtor while in Chapter 11;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

9

7. The scheduled claims;

8. The estimated return to creditors under a Chapter 7 liquidation;

9. The accounting method utilized to produce financial information and the name of the accountants responsible for such information;

10. The future management of the debtor;

11. The Chapter 11 plan or a summary thereof;

12. The estimated administrative expenses, including attorneys' and accountants' fees;

13. The collectibility of accounts receivable;

14. Financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

15. Information relevant to the risks posed to creditors under the plan;

16. The actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

17. Litigation likely to arise in a nonbankruptcy context;

18. Tax attributes of the debtor; and

19. The relationship of the debtor with affiliates.

See In re Metrocraft Publ'g Serv., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); In re Microwave Prods. of Am., Inc., 100 B.R. 376 (Bankr. W.D. Tenn. 1989) (applying Metrocraft factors to deny approval of a disclosure statement).

In addition to the Metrocraft factors, LR 3016(f) requires that a disclosure statement should include, at a minimum, the following matters:

1. A statement regarding the debtor's background, ownership, and pre-bankruptcy operating and financial history;

2. A discussion of the reason for the bankruptcy filing;

3. A summary of proceedings to date in the bankruptcy case;

4. A summary of assets;

5. A description of unclassified claims, including estimated amounts of administrative and priority claims;

6. A description of claims by class, including an estimate of the amount of claims in each class as reflected by the schedules and proofs of claim on file;

7. A summary of the treatment of unclassified and classified claims under

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

10

the proposed plan;

8. A summary of the treatment of executory contracts under the proposed plan;

9. A liquidation analysis;

10. A statement as to how the proponent intends to achieve the payments proposed; and

11. The disclosures required by 11 U.S.C. § 1129(a)(5).

LR 3016(f).

Finally, a court may refuse to approve a disclosure statement when it is apparent that the plan which accompanies that statement is not confirmable. See United States Brass Corp., 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); In re Atlanta West VI, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988). It would be a wasteful and fruitless exercise of sending a disclosure statement to creditors and then soliciting votes on the proposed plan when the plan is patently unconfirmable.

**B.    The Proposed Disclosure Statement Does Not Provide Adequate Information.**

**1.    The Description of Debtor's Background And Events Leading Up to the Bankruptcy Filing Are Self-Serving, Irrelevant, Unsubstantiated And Misleading.**

The Bank objects to numerous statements in the Proposed Disclosure Statement that are nothing more than the Debtor's own unsubstantiated, self-serving opinion and belief and, in some cases, are fundamentally untrue. These statements do not further the goals of providing adequate disclosure to creditors voting on the Proposed Plan, instead are intended for nothing more than to portray the Bank in a negative light and are based on Debtor's skewed version of history. Such statements have no place in a disclosure statement:

> [S]tatements of opinion or belief without factual support do not belong in a disclosure statement. Additionally, it is implicit in the cases that the opinion itself is inappropriate, regardless of whether the debtor sets forth a factual basis. This interpretation is consistent with the goals of Section 1125, in that the purpose of the disclosure statement is to present the parties voting on the plan with sufficient factual information to independently evaluate the merits of the proponent's plan. It is clear that one cannot arrive at an informed decision based upon a proponent's self-serving opinion. . . .It is inappropriate to lobby even if supporting facts are present.

In re Egan, 33 B.R. 672, 675 (Bankr. N.D. Ill. 1983).

Moreover, "adequate information" consistent with Section 1125 precludes the inclusion

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

11

of misleading information in a disclosure statement. In re Dakota Rail, Inc., 104 B.R. 138, 148-149 (Bank. D. Minn. 1989).

The Debtor provides a purported list of projects that the principals of its majority member, Delta Point, LLC, have "acquired, rehabbed, expanded and built" which have absolutely no relation to Debtor's single asset, Regal Plaza. In addition, the Debtor includes the purported occupancy and status of these unrelated projects. All of this is done without any evidentiary foundation. NSB objects to the inclusion of this narrative as it is irrelevant to the Proposed Plan of Regal Plaza and has no evidentiary foundation.

Moreover, the Disclosure Statement fails to identify the members that comprise the current "Equity Owners" of the Debtor.

The Debtor alleges that "[f]or reasons unknown, Nevada State Bank would not promptly advance the monies agreed to in the May, 2008 extension" and "[t]he $500,000 was disbursed after the presentation of receipts and statements for work and commissions." See Proposed Disclosure Statement, p. 12, ll. 6-7, p. 13, ll. 7-8. The Debtor goes on to state the "Nevada State Bank has refused to distribute these funds." See Proposed Disclosure Statement, p. 13, l. 8. First, the Bank assumes that the Debtor intended to reference the Twelfth Modification executed in May 2009 (and not May 2008). The Eleventh Modification of the Note executed in May of 2008 provides that "no further advances are available under the Note." See Eleventh Modification attached to the Ferra Declaration as Exhibit "18." Moreover, Debtor is fully aware that certain conditions were required in order to advance funds and that Debtor failed to fulfill those conditions. See Twelfth Modification. The Bank objects to the Debtor's depiction of the events as misleading and unsubstantiated.

The Debtor alleges that "Regal Plaza has discussed with various officers of Nevada State Bank the financing of the Plaza. The spirit of these discussion often, if not always, were to provide permanent financing, or at lease a mini-perm instrument. What was agreed to verbally often would not be provided in writing. Nevada State Bank then attempted to avoid advancing funds for improvements to which it had previously agreed." See Disclosure Statement, p. 12, ll. 9-13. The Bank strongly disagrees with the Debtor's rendition of the "spirit of the discussions".

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

12

Debtor continues spouting the unsubstantiated opinion of its principal by stating that "[i]t is the feeling of Regal Plaza, LLC that Nevada State Bank's actions, or lack thereof, in this matter have been disingenuous. It is also felt that the Bank's usage of short term extensions and the fees and costs associated with them were excessive." See Proposed Disclosure Statement, p. 12, ll. 17-19. These opinions and beliefs of the Debtor's principal have absolutely no place in, and serve no purpose in furthering, a disclosure statement. Moreover, as Debtor so aptly noted, the Loan was extended numerous times for short periods of time to accommodate Debtor's inability to complete the project by the original maturity date and subsequent extended maturity dates. It is particularly ironic that the Debtor now objects to the Bank's granting of **twelve extensions** and then accuses the Bank of something sinister because it actually charged a fee to grant the extensions. The Original Note matured over five (5) years ago, and then, as now, the Debtor has no ability to pay the Bank the amounts due under the Loan. The Bank objects to the inclusion of this language in the Proposed Disclosure Statement as it is untrue, misleading, unsupported by any evidence, and unnecessary.

In addition, and, in case the Debtor somehow misunderstood the "spirit" of any discussions or the Bank's intentions regarding the Loan, the Loan Documents themselves prohibit Debtor's arguments in this regard as those documents no less than nine separate times provide in capital and bold letters that:

> **THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE BANK SHALL BE DETERMINED SOLELY FROM THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND ANY PRIOR ORAL OR WRITTEN AGREEMENTS BETWEEN THE BANK AND BORROWER CONCERNING THE SUBJECT MATTER HEREOF AND OF THE OTHER LOAN DOCUMENTS ARE SUPERSEDED BY AND MERGED INTO THIS MODIFICATION AND THE OTHER LOAN DOCUMENTS. THIS MODIFICATION AND THE OTHER LOAN DOCUMENTS MAY NOT BE VARIED BY ANY ORAL AGREEMENTS OR DISCUSSIONS THAT OCCUR BEFORE, CONTEMPORANEOUSLY WITH, OR SUBSEQUENT TO THE EXECUTION OF THIS NOTE OR THE LOAN DOCUMETNS. THIS MODIFICATION AND THE OTHER LOAN DOCUMENTS REPRESENT FINAL AGREEMENTS BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

13

See Fourth Modification to the Twelfth Modification, Exhibits "11" through "19" to the Ferra Declaration.

The Debtor alleges that it has filed Monthly Operating Reports. See Disclosure Statement, p. 13, ll. 11-12. This statement is false. Debtor has only filed one Monthly Operating Report for September of 2010. Debtor has not filed Monthly Operating Reports for October 2010 or November 2010. The Bank objects to this statement as it is simply untrue.

**2. The Proposed Disclosure Statement Fails to Provide Adequate Information Regarding the Valuation of the Real Property.**

The Proposed Disclosure Statement alleges that the "As Is" value of the Real Property is $8,600,000 and provides only a two-page summary of the Jack Appraisal as an attachment. Nevada State Bank objects to the valuation in substance and because of the Debtor's failure to provide full disclosure of the appraisal for creditors' evaluation. Nevada State Bank has engaged Morse & Associates to appraise the Real Property. See Morse Declaration, p. 1, ll. 26-28 and p. 2, ln.1. Morse has opined that the Real Property has an "As Is" valuation of $4,200,000, with a stabilized value as of April 2011 of only $6,350,000. See Morse Declaration.

Moreover, it is clear that the "As Is" valuation in the Jack Appraisal is based entirely on a condition that does not exist and never has existed at the Real Property- an 80% occupancy rate. See Jack Appraisal, pp. 66, 74 ("The subject property is less than 20% vacant", "the subject appears to be less than 20%" vacant). Pursuant to Debtor's own admissions in the Proposed Disclosure Statement, less than 50% of the tenant space is currently occupied. See Proposed Disclosure Statement, p. 14, ll. 5-7 (stating that 22,510 of the 56,097 of rentable space or 40% of the rentable space is currently occupied by tenants).

Disclosure of the entirety of the Jack Appraisal is essential to the creditor's ability to make an informed decision about the viability and credibility of the Proposed Plan. Providing a two-page cover letter from Jack that purports to provide an "As Is" valuation without the entirety of the Jack Appraisal is misleading and fails to provide adequate information for approval of a plan of reorganization proposed by a single-asset real estate debtor.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

14

### 3. The Proposed Disclosure Statement Fails to Provide the Accurate Balance Owed To the Bank.

The Proposed Disclosure Statement states that the amount owed on the Bank's Secured Claim under the Loan is $7,500,000. See Proposed Disclosure Statement, p. 14, l. 8, p. 19, l. 13. As stated previously, the balance of the Loan as of the Petition Date was approximately $7,506,000.00 and, if the Jack Appraisal is adopted, interest and attorneys' fees continue to accrue post-petition. As of January 1, 2011, the interest accrued post-petition was $234,81.515, with post-petition attorneys' fees and costs and other fees and costs accruing. See Ferra Declaration, p. 6, ll. 8-16.

### 4. The Proposed Disclosure Statement Fails to Provide Adequate Information Regarding the Property's Current Financial Situation.

The Proposed Disclosure Statement provides that the Allowed holders of Claims will be paid from Debtor's "Projected Income" attached to as Exhibit "B" thereto. Exhibit "B" to the Disclosure Statement reflects the Debtor's estimates of rents looking forward 12 months. Exhibit "B" amounts to the Debtor's wish list. A cursory review of the "rent roll" reveals basic issues with this "future rent roll".

The truth is that Euphoria Salon has not executed a lease and has absolutely no obligation to enter into a lease with Debtor. The truth is that the lease with Healthcare Properties was executed a year ago and there is absolutely no evidence that this is still a viable tenant or that it is still willing to pay rental rates agreed to a year ago. Additionally, there is a "CAM charge concession that indicates that the tenant will only be responsible for the 2,410 square foot suite CAM charges during months 1-18 of the lease and will only be responsible for CAM reimbursements on half of the 15,000 square feet (i.e. 7,500 square feet) for month 19-20 of the lease." See Jack Appraisal p. 89. This concession foregoes approximately $80,000 in CAM reimbursements during month 1-30 of the lease. See Jack Appraisal, p. 89. Exhibit "B" clearly and incorrectly provides for CAM income on the entirety of the Healthcare Properties' space.

The rent for National Power Sports is listed on Exhibit "B" at $10,234 per month or $122,805 annually. However, the reality is that the Debtor agreed "to a concession allowing approximately $71,303.75 or about $8.75 per square foot tenant improvement" on this space See

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

15

Jack Appraisal, p. 89. According to the October 2010 Rent Roll, National Power Sports lease is not slated to commence until April 1, 2011.

On Exhibit "B" the monthly rent for Hit Track, LLC is listed at $2,275. However, pursuant to the October 2010 Rent Roll, the monthly rent is only $611.00 and the "[f]ull rent of $2,275 begins 7/1/2012."

Pursuant to the October 2010 Rent Roll, the Excel Defense Studio lease expires on October 21, 2011. There is no evidence that Excel Defense Studio intends on renewing its lease (particularly as what appears to be an above-market rent) passed October 2011, yet the lease is included in Exhibit "B."

Debtor further fails to disclose the status of the tenant improvements, the remaining costs to complete the tenant improvements, how Debtor intends on paying for the tenant improvements or the continued viability of the Healthcare Properties' lease. In addition, as of the end of October, 2010, counsel for Debtor informed the Bank that American Sand & Gravel had not executed a lease, yet it is also included on Exhibit "B." See Higgins Declaration, p. 2, ll. 4-5. This is consistent with the October Rent Roll that list the lease commencing January 1, 2011.

While the Debtor does state that if the Euphoria lease is not signed and the Healthcare Properties build out is not complete, monthly income would drop $20,000, this statement is misleading as it implies that this $20,000 is presently included in monthly income. See Proposed Disclosure Statement, p. 20, ll. 23-27. There is no mention of the contingencies of National Power Sports or American Sand and Gravel leases. According to Exhibit "B", as currently occupied, the monthly income should be about $40,000 ($73,419 less $3,500 projected rent for American Sand, $8,250 projected rent for Healthcare Properties, projected income for National Power Sports $10,234 projected rent and $9,250 projected rent for Euphoria) and the Property is only 50% occupied. This is particular troublesome, as according to the Proposed Disclosure Statement, has Debtor only collected $32,276 in October, 2010 and $34,568 in November 2010. See Proposed Disclosure Statement, p. 15, ll. 24-25, p. 16, ll. 1-3. In addition, according to Exhibit "B" the CAM income is $3.60 per square foot rented with $181,033 in CAM income per year estimates. Again the reality is something very different, with only approximately 22,500

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

16

square feet rented at $3.60 per square foot, the CAM income is only $81,036. Debtor's inability or unwillingness to provide an actual and consistent rent roll and monies collected is nothing new to its relationship with the Bank.

Debtor should be required to provide an accurate picture of the current financial and tenant situation in the Proposed Disclosure Statement in order for creditor's to access the reality of Debtor's estimates and the viability of the Proposed Plan.

C. **The Disclosure Statement Should Not Be Approved as the Proposed Plan is Patently Unconfirmable.**

A disclosure statement should be disapproved where the plan it describes is patently unconfirmable. See In re Eastern Maine Electric Co-op., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991); see also In re 266 Washington Assoc., 141 B.R. 275, 288 (Bankr. E.D.N.Y.), aff'd, 147 B.R. 827 (E.D.N.Y. 1992); In re Atlanta West VI, 91 B.R. 620 (Bankr. N.D.Ga. 1988). The Proposed Plan contains provisions and terms that are in violation of bankruptcy law, making the Proposed Plan unconfirmable on its face.

One of the requirements of confirmation is that a plan be "fair and equitable" 11 U.S.C. § 1129(b)(2). This requirement is met where the dissenting claimant received payment in full over a reasonable period of time with an appropriate discount factor being paid. In re White, 36 B.R. 199 (Bankr. D.Kan. 1983).

The Debtor proposes that the loan be amortized over 30 years with a maturity in ten (10) years with interest for 2 years at 3% and thereafter, at 4%. This Loan was intended as a short-term loan with a one-year maturity (albeit extended because the Debtor could not pay the Loan at the original maturity and for years subsequent to that). A debtor should not be allowed to speculate with a lender's money for a long period of time, particularly when that was not the original intention of the parties. In re Manion, 127 B.R. 887 (Bankr. N.D. Fla. 1991); In re White, 36 B.R. at 202.

Debtor's Proposed Disclosure Statement and Proposed Plan further provide that the Bank's Secured Claim is approximately $7,500,000. If Debtor's estimates of the Bank's Secured Claim is only $7,500,000, the Proposed Plan fails to provide for the payment of post-petition

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

17

interest and attorneys' fees and costs through the Effective Date of the Plan. To comply with Section 1129(b), a plan may not divest a creditor of a contractual right to post-petition interest and attorneys' fees and costs where as here the Debtor contends that the secured creditor is oversecured and the equity interest is retained[5]. Dow Corning, 456 F.3d at 678; In re SNTL Corp., 571 F.3d 826 (9th Cir. 2009).

A plan is not "fair and inequitable" if the risk of failure is unfairly shifted to the creditor. Aetna Realty Inv., Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.), 166 B.R. 428, 436 (Bankr. C.D. Cal. 1993) (finding an implicit requirement of the fair and equitable standard set forth in Section 1129(b) is that a plan may not impose an unreasonable risk of its failure on the secured creditor).

The Proposed Disclosure Statement and the Proposed Plan provide that the Loan, as modified by the Proposed Plan, "will be assumable." See Proposed Disclosure Statement, p. 19, ll. 20-21. This means, for example, that if the Loan balance owed to the Bank were $7,000,000 and Debtor sold the property for $8,000,000 ($1,000,000 cash with assumption of the $7,000,000), at any time in the future, the Bank would not be paid but would be forced to continue on with a new and unknown borrower (and credit risk), and the Debtor would be allowed to keep $1,000,000. Under no scenario, is this "fair and equitable" and such a result absolutely and unreasonable shifts the entire risk of the failure of the Real Property on the Bank.

Nor does the Debtor tell the creditors (in particular, Nevada State Bank) what will happen to the Guarantees under such a scenario where the Loan (as modified by the Plan) would be assumed by a third party. However it is well-settled law that the Ninth Circuit does not permit nonconsensual non-debtor releases. In In re Lowenschuss, 67 F.3d 1394 (9th Cir. 1995), perhaps the strongest pronouncement against non-debtor releases by a discharge or release provision in Chapter 11 plans, the court stated its reasons why such releases are impermissible:

> The bankruptcy court lacks the power to confirm plans of reorganization which do not comply with applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Pursuant to 11 U.S.C. § 524(a), a discharge under Chapter 11 releases the debtor from personal liability for any debts. Section 524 does not,

---

[5] Even though the Proposed Disclosure Statement and Proposed Plan provide that the Equity Security Holders are "terminated", it appears as though one of the two current equity holders, Delta Point, LLC, is actually retaining its equity interest for purported "new value".

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

18

however, provide for the release of third parties from liability; to the contrary, § 524(e) specifically states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors. American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.), 885 F.2d 621, 626 (9th Cir.1989); Underhill v. Royal, 769 F.2d 1426, 1432 (9th Cir.1985); Commercial Wholesalers, Inc. v. Investors Commercial Corp., 172 F.2d 800,801 (9th Cir.1949); see also Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.), 171 B.R. 71, 77 (9th Cir. BAP 1994) (holding reorganization plans which proposed to release non-debtor guarantors violated § 524(e) and were therefore unconfirmable); Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts, Inc. (In re Rohnert Park Auto Parts, Inc.), 113 B.R. 610,614-17 (9th Cir. BAP 1990) (finding that a reorganization plan provision which enjoined creditors from proceeding against co-debtors violated § 524(e)); In re Keller, 157 B.R. 680,686-87 (Bankr.E.D.Wash.1993) (refusing to confirm a reorganization plan that compelled a creditor to release liens against a non-debtor's property).

In American Hardwoods, 885 F.2d at 625-26, we explicitly rejected the argument-advanced by Lowenschuss today-that the general equitable powers bestowed upon the bankruptcy court by 11 U.S.C. § 105(a) permit the bankruptcy court to discharge the liabilities of non-debtors. Noting that "section 105 does not authorize relief inconsistent with more specific law," we concluded "the specific provisions of section 524 displace the court's equitable powers under section 105 to order the permanent relief [against a non-debtor] sought by [the debtor]." Id. at 625-26.

Lowenschuss, 67 F.3d at 1401-02.

Additionally, although the Debtor fails to disclose the identity and purpose of the "insider general unsecured claims" of $950,000 in Class 3b, the Bank believes these creditors consist of the insider leasing company, Tower Realty, the insider construction contractors, Taylor Consultants and Nevada Underground.[6] The Bank believes these entities are all owned directly or indirectly by the Carnesales. Debtor proposes that if monthly payments are being made to the Bank on the modified Loan that the insiders can receive payments. Thus, Debtor proposes to repay Debtor's affiliates prior to the Bank being paid in full. Such treatment is not "fair and equitable" and again, unduly shifts the risk of the failure of the project entirely upon the Bank.

As asserted by the Bank, the value of the Property is $4,200,000 and the Bank is woefully undersecured. The Disclosure Statement makes no provisions for the possibility that its valuation is incorrect and that the Bank has a large unsecured claim and Section 1111(b) rights.

---

[6] The fact that the Bank has to guess at who these insider creditors are clearly reflects inadequate disclosure.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

Moreover, to the extent that the Bank has an undersecured deficiency claim, the Proposed Plan is unconfirmable as the Proposed Plan violates the absolute priority rule.

Although not disclosed in the Proposed Disclosure Statement, apparently the Debtor has two members, Delta Point, LLC and Efram A. Rosenfeld VI, Inc. See Proposed Plan, p. 3, ll. 1-1. Notwithstanding Debtor's depiction of the termination of old equity interests, one of Debtor's existing two members is actually retaining its interest for nothing and taking Rosenfeld's membership interest in exchange for "new value" of not less than $500,000. See Proposed Plan, p. 4, ll. 22-25. It is wholly unclear what Delta Point intends to provide as "new value" and the Bank objects to the Proposed Disclosure Statement on this basis for failure to provide adequate disclosure. The Proposed Plan states that the "transfer of the additional funds for tenant improvements should be considered 'new value' provided by Delta Point, LLC." See Proposed Plan, p. 6, ll. 5-6. There is no further explanation of what comprises this proposed "new value", however, upon information and belief Debtor intends on arguing that monies already paid post-petition by Delta Point or some related entity to pay for ongoing tenant improvements without Court approval or oversight as an unauthorized post-petition loan constitutes "new value". The Debtor's managing member cannot ignore the constraints of the Bankruptcy Code by making unauthorized loans or gifts to the Debtor post-petition without any oversight by the Court or the creditors and then turn around and call it "new value".

### III.
### CONCLUSION

WHEREFORE, the Bank respectfully requests that the Court deny approval of the Proposed Disclosure Statement on the grounds that it is filed in support of a Proposed Plan that is not confirmable and that it fails to provide adequate information.

DATED this 7th day of January, 2010.

GORDON SILVER

By: _____
BRIGID M. HIGGINS, ESQ.
Nevada Bar No. 5990
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Attorneys for Nevada State Bank

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

20